We lose your voice so you need to stay right behind that podium during your entire argument. The other thing I would mention to you is that rebuttal is for rebuttal only and on rebuttal time don't bring up any subjects that have not been brought up before either by you or the opposition. So that we call the first case of the day in the United States of America v. Oti and others. And Ms. Watson representing Okichukwu. I'll let you pronounce it. Good morning my name is Delani Watson and I'm representing Dr. Theodore Kechukwu, one of the four errors of a sufficient magnitude requiring that Dr. Okichukwu's convictions be reversed. But because of the time constraints I'm going to limit the issues that I have to talk about. The first issue goes to the legal conclusion expressed by Agent Gordon during the government's case in which he stated a legal conclusion to the jury. And starting out the prosecutor asked the question, based upon the evidence that you saw, do you have an opinion as to whether or not those security guards were using, carrying, and brandishing a firearm in furtherance of drug trafficking activity. The agent immediately responded absolutely and then continued to try to answer saying those firearms and those security guards were there. And he was met by repeated objections. And the objection being that his response would call for a legal conclusion. That was thereafter a significant amount of back and forth between the attorneys and the judge helping making it clear to him exactly what the issue was. Then later on Agent Gordon was asked, now assuming that the jury were to find that a pill mill was actually being operated and have you a chance in looking at all the evidence, do you have an opinion as to whether or not you believe the firearms were being used to protect this drug enterprise? Assuming that the jury were to so find. And his response was that my opinion is that the firearms used in this particular activity were very similar to cases that he had investigated in the past. And then he went on to say, and those individuals carrying those firearms or using those firearms in furtherance of the drug trafficking activity and those individuals who hired those security guards or law enforcement officers were also using those firearms in furtherance of the drug activity. It is our position that that statement in combination with the prior question asked by the prosecutor put squarely before the jury a legal opinion. That in fact, by the security guards having firearms on them during the time that they were working at the medical clinic, that that was sufficient evidence and that in fact the agent was telling the jury that the defendant was guilty of the offense. This situation was even aggravated more because when I looked back at the jury instructions, the jury instructions actually said that ATF Special Agent Blake Boyd, who testified about drug trafficking and the use, carrying, and brandishing of a firearm, doing in relation to a drug trafficking crime. So this squarely put before the jury his opinion that in fact the defendants were. He just, he got down in the jury box. I'm sorry. He got down into the jury box and made a determination of fact. Yes, he did. And if you look at the evidence that was before the jury, which was essentially that Dr. Okechukwu agreed with his office manager, because Dr. Okechukwu did not initiate anything having to do with the hiring of the security guards. And what if it's harmless? In other words, is there any basis to say that he was not brandishing and carrying a firearm in connection with a drug offense, once you establish it's a drug offense and he's got a gun? Well, Your Honor, there was because the jury seemed to have some difficulty with whether or not it met the definition because they sent out a jury note asking the judge what all constitutes use. And so they had some issues apparently just given the jury note that they sent out as to whether or not that evidence squared up to what the jury instructions said. Of course, that would affect only the convictions on the gun offenses. Yes, sir. That would only affect those particular cases. Isn't protecting the proceeds of illegal drug activity carrying on a drug business? Well, Your Honor, it would be if that's what the jury believed. But as I said, clearly the jury had some issues with it. And the evidence was not clear that Dr. Okechukwu even initiated the security guards actually having the firearms. It sounds like me that the jury agreed on it, though, when they found him guilty. Well, they agreed on it when they found him guilty, but it's our position that without that additional finger on the scale, they would not have found him guilty. But your question, whether it was harmless, though, I mean, the evidence was so overwhelming that they didn't want to do it. They had guns in a drug operation, and it was there to protect the drug operation. I mean, nobody questions that, that it was to protect the drug operation from theft. Well, there was some evidence that Dr. Okechukwu, though, didn't have the intent that there actually be an armed fire, armed security guards. The evidence was that that was started by his office manager, and that he then acquiesced to it. And there was also testimony that... But that would be enough to hold him guilty to it if he acquiesced, which he obviously did. He paid the bills. Well, he did do that, Your Honor. But as I said, there is some question about whether or not the jury had some issues with it simply because of that note. And without knowing whether or not that, because they also found the other two defendants not guilty of the offense. Okay. Thank you, Ms. Watson. Thank you, Your Honor. Mr. Brodin, representing Oahu. Oahu. Yes, it is. Challenging names. It's Mr. Iwobu. Oahu. May it please the Court, my name is Clinton Brodin. I just want to, in my limited time, focus on the liberty and ignorance instruction that was given in the case. I'm sure the standards go back to Laura Velazquez back in 1990, that in order for the instruction to be appropriate, there's got to be a subjective awareness of high probability of the existence of illegal conduct, and the defendant purposely contrived to avoid learning of the illegal conduct. And Laura Velazquez goes on to say, the key aspect of the liberty and ignorance is the conscious action of the defendant. And then we take that all the way to the Skilling case in 2009, where the court wrote, this court wrote, the source of this risk is the potential confusion about the degree of deliberateness required to convert ordinary innocence, ignorance, into guilty knowledge. In other words, the jury may erroneously apply a lesser mens rea requirement, a should-have-known standard of knowledge. And in this case, that danger is exacerbated. It's exacerbated in two ways. One is Issue 3, you have the district court telling the jury that really the issue in this case is whether the prescriptions were properly issued, when in fact, that is not the issue that the jury was supposed to require. And then you have the government right out of the box in its closing argument, the first thing they say is, this case is about fool me once, shame on me, shame on you, fool me twice, shame on me, implying that colloquialism is about negligence, about allowing yourself to be fooled. So you have the deliberative construction and then it's exacerbated by these actions by the district court and the government in its closing argument, in the beginning of its closing argument. So is it your position that there isn't any evidence of a deliberate trying to be blind in this, to the situation at all in the record? Or is it your position that really this is one of those cases where it's not a, that they're saying there was knowledge and there was, and so therefore it's not appropriate because it's the case where they're trying to prove there was plenty of actual knowledge? Really both, Your Honor. It is an actual knowledge versus no knowledge and it is that there is no evidence in the record that he was taking any conscious steps to avoid knowledge. So it's really a combination, or not a combination, but it really is both. So it's an actual knowledge case where the deliberate instruction is inappropriate. Well, we have a lot of those cases and we've said many times that it's wrong and they should keep giving it, but we also often affirm those cases because we say it's harmless. Can you address that? And I did and I put it in the footnote. I mean, the court says this should, the instruction should rarely be given and certainly in my experience, it's rarely excluded. District courts are going to continue to give these instructions until this court steps to the plate and starts reversing these cases. I think we did reverse one a couple years ago. The last one I saw was back, I don't know, 10, 12 years and I could be wrong, but the government always wants to use this as a backup in cases and in my experience, some judges just acquiesce to that. Some judges actually look at this court's law, but the government always points to these cases and say, well, the court allows it. And I think this court has to do its job and sort of step to the plate and say, enough is enough. But we've said we don't allow that. We've said it is wrong repeatedly. And yet how many times? Unless it's properly evidence that there's willful cover up. And yet how many times does an appellate lawyer stand before you and argue this? And it's argued because the government always goes to the court. How are you prejudiced in this case by the instruction? Because I think this was a negligence case. They're based on what the judge told the jury and what the government told the jury. They're really arguing negligence. And it allows the jury to possibly convict based on negligence or recklessness, which is not the standard. And that's, going back to skilling, that's what the court recognized the danger of giving this instruction is. So that really is the harm. You have the government saying it's a fool me once, shame on you, fool me twice, shame on me case. You have the court telling the jury, well, it's really only about deciding whether these prescriptions were properly issued when that, you've got to go to intent. And then you, on top of this, have this deliberate ignorance instruction. And I think there was real harm in this case. And I suggest to the court that, as I said here in response to Jailrod, and I said in the footnotes, because I see this happen over and over again, I think it's time for the court to start reversing these cases. Otherwise, you're going to have people like me stand before you and keep arguing. Mr. Broden. Thank you. Ms. McVeigh. I see you are representing Mr. Oti. Yes, Your Honor. My name is Diane Jones McVeigh. I'm here on behalf of Ms. Oti. Mr. Broden has already argued deliberate ignorance instruction, so I'm arguing the sufficiency of the evidence issue with regard to Ms. Oti. It is our position that she had no knowledge of the unlawful purpose of the agreement and that she distributed and dispensed controlled substance within the scope of the professional practice with a legitimate purpose, which was to treat the clients. On April 17, 2012, James Stapleton from the U.S. Department of Health and Human Services and FBI agent Diane Hernandez came and talked to Ms. Oti. The indictment is from January 2012 to December 2013. So in April, she's talking to agents from the Office of Health and Human Services and FBI agents, and she specifically tells them the following, that she had been working with a Michael Anderson, a chiropractor, that her job with regard to him was to treat his patients who needed pain management. She was a physician assistant, and she was under the supervision of a Nicholas Pardone, the subject of their investigation. She told him that she worked three days a week, about 20 hours a week, and she would prescribe controlled substance to his patients who needed them. Why does she have pages of prescriptions already filled out for the highest strength of hydrocodone on these non-refillable prescriptions? Well, how is that appropriate for her to have these pre-filled out for the all for the highest strength, all non-refillable? That seems somewhat suspicious, doesn't it? Well, Judge Oduor, I'd like to, before I answer that, I'd like to point out she had been trained under Mr. Pardone. She prescribed hydrocodone and Xanax, 30-day supply, one-time basis, first-time patients, cash system. The agent sat down and told her she was not a subject of the investigation, that they were looking at her supervisor, Pardone. So she was trained that way. That's all she knew. She started as a physician assistant in 2001. She worked for a dermatologist, and then in 2006, she started working for other people. So when she went to Mr. Akechukwu's office, she was only doing what she had been trained by Nicholas Pardone. Isn't what she's been trained, doesn't it just on its face seem suspicious? And so you can't just do what, you know, you can't be just following orders if what you're doing is wrong and would be abundantly clear that it's wrong. Well, Your Honor, it's our position that she did not know it was wrong. She was in medical school, living in the, going, working, going to medical in the Caribbean. She doesn't get paid. She gets paid $35 a patient. She has no control on how many patients come in. If one comes in or two comes in. She's just doing her paperwork, and she's meeting with the patients. The expert testified that it was Was she prescribing any kind of medicine other than this pain medicine? She prescribed different types of pain medicine. There was a Mr. Murray. She prescribed Mr. Nelson. She prescribed, I think, Nexafil and another prescription. But most of the prescriptions were 120 milligrams of hydrocoating, and the expert said that that was within the normal scope of the profession. The people came in, and they were in the lobby. Detective Morgan and Mr. Murray, the only two witnesses that claimed that she treated them, said that they were told in the lobby, make sure you set your level, or it's 8 to 10, make sure, so that you can get medication. Well, why are they being coached other than they're trying to deceive the treater? They're being coached in the lobby to deceive the treater. You're trying to tell the court that someone who can finish medical school is ignorant to the 30,000 people a year that are dying in this country from accidental opiate overdoses? She doesn't think it's wrong that 99 percent of what she writes are opiates? You want us to believe that? Your Honor, she was in medical school. She started medical school in 2006. She was just a physician assistant under the supervision of doctors who were teaching her how to do the practice, and this is what they're teaching her. And the fact is, that was the government they stood up and argued that she worked for three peel mills. That does seem like a deliberate ignorance instruction might be appropriate there. Yes, Your Honor, but she wasn't deliberately ignorant. This is all she knew, and she was doing her job. But if she's claiming she didn't know what she was doing. She was doing what she was taught. She was treating the clients properly. According to Ms. Wagner, the expert, she said the treatment was in the scope of professionalism. But isn't that more or less what you're making now is a jury argument? You say what? A jury argument. You're making to us a jury argument. Well, no, Your Honor, what I'm trying to point out, though, is that there is no evidence to show she agreed with anything. The only witness they had was Mr. Znegwe, and he said that he believed that they knew. There was no one who said she agreed to anything. Then the government tried to argue that she knew because she was singing Jerry Reed's, singing his name in the hallway, and he called her three times. That was part of their closing arguments to try to say she knew. I understand. I mean, but, I mean, wasn't that ultimately a jury question? She's dispensing hundreds and hundreds of prescriptions on drugs that, as Judge Starrett says, have nationwide publicity of being overprescribed everywhere. I mean, it just seems like that she, that there was enough evidence for the jury to consider your argument and consider the evidence the government produced and decide against you. Well, Your Honor, our position is that she was not deliberately ignorant, that she was following within the practices. She was not aware that the drugs were being diverted. She didn't benefit from the drugs being diverted. I mean, she didn't get paid based on prescriptions or anything of that nature. Okay, Ms. McVeigh, we have your argument. You've made a passionate argument for your case. Mr. Rutledge, we'll hear from you. May it please the Court. Bruce Anton for Kelvin Rutledge. We had one point of error. It involved the testimony of a witness who had an undisclosed bias against Nigerians, and I want to address in my brief time a couple of the red herrings, I think, in the government's brief. First of all, NAPOE does not apply strictly to the state, the government presenting false evidence. It also includes the burden to correct a false impression. Secondly, good faith and bad faith has gotten no part of this calculation. It was never mentioned in our brief. We're not contesting that. The point is that the assistant U.S. attorney who tried the case, being put on notice that this woman had a bias, asked her on the stand if she had such a bias. She was not on the defense, was allowed to ask her if she'd made those statements. That bias and that impression went uncorrected through the bulk of the trial. Now the government argues that because of other evidence, that even if the testimony was false and even if it was uncorrected, it's immaterial. But in our brief, we cite, and I draw the Court's attention to Agler's and NAPOE, saying that the Court should apply the strictest kind of scrutiny in this situation, because the false testimony uncorrected goes to the very integrity of the criminal justice system. And I think in this case, although it's true that there was other evidence of the guilt of the, there were other evidence of people, mostly police witnesses, reaching the same conclusion that these people weren't running a legitimate clinic, the testimony from Ms. Gaffin was one of the few civilian witnesses, one of the more objective observers, that came out and said, hey, this doesn't look like a legitimate business to me. And I think primarily she said that because of the bias that she harbored. I do think her testimony was immaterial, and I do think a reversal is required. But isn't the problem that it's not clear that she ever made the bias statement that would be make your statement, the statement at trial, false? Because the person says they don't know how they got that in the notes. The other two people who were there said they didn't recall anything of it. So there's at least some possibility that the notes are inaccurate. And as long as that exists, you can't establish that she was a liar that day. Well, as the indirect answer to that, I'd say that, you know what, recording these interviews would go a long way to correcting those problems, which is something I think might not intentionally be done. But here you have a trained U.S. attorney granted a new one who was taking meticulous notes. He saw it, he wrote it down, he was convinced enough that it happened that he made a Brady disclosure about it. It's possible that he made all that up? I suppose anything's possible. It seems highly unlikely under the circumstances. Thank you. Thank you, Ms. Danton. And now it's the time to hear from the United States Attorney. May it please the Court, Gail Hayworth on behalf of the United States. All right, I'll start with addressing the issues that Defense Counsel brought up, starting with the legal conclusion. First of all, it's unclear whether the term, in furtherance, has a meaning that's so distinct from its ordinary usage that it actually states a legal conclusion. In fact, the Defense Counsel used the term as a statement of fact when he asked the security guard, Sam O'Donnell, or Sam Donnell, whether he carried his gun in furtherance of his security job. And he even argued to the Court that that statement, in furtherance of that Sam Donnell made, alone supported his Rule 29 motion. Ms. Hayworth, you weren't the prosecutor, were you? No, I wasn't, Your Honor. Okay. We ask them over and over again not to get close to the line with these agents, and we have all this, we've done two or three opinions. Why are we getting close to the line where we're even having an issue? First of all, the distinction between legal conclusion and fact-based statement is a very murky, difficult— If it's murky and difficult, why isn't the government, who has all this evidence, way on the side where there's not even an issue? That's the question. I understand you're arguing a technical argument that it could be factual instead of just legal, so it might not be error. But if you've got all this evidence and you're the government and you're supposed to be doing something higher, why is it that you're near the edge of the line with these experts in repeated cases? These agents, we have all these cases and we say, well, this maybe is right up against the line or this was over the line. Why are we even near the line with these agents and their testimony at trial? I think in the heat of trial and when you think of a term in terms factually, it may just come out in your questioning. The prosecutor in this case immediately tried to give more meat on that statement later by having the witness testify. Drugs are the tools of the trade. I mean, why do you keep—I mean, a strong case, you had a strong case, it seemed to me, but you keep putting experts on the witness stand that get right down there, not only in the judge's chair, but in the jury's chair as well because, I mean, they're talking about facts and law. I mean, he's in furtherance of and you're asking—essentially, you might as well ask, in your opinion, are these people guilty of the crime they're charged with? I mean, it's—I find it very distasteful. I mean, in one of these days, it's going to come back to haunt you. I mean, on a big case, you're going to get— And a court has held that juries don't typically know how drug businesses run, so an expert would maybe tell them how they're typically run, how guns are typically— Well, they can do that, maybe, I mean, up to a point, but didn't you ask, in this case, under these facts here, is that in furtherance of drug trafficking? Didn't you ask them that? The actual question that the prosecutor asked after objections to further hone the question was, were the guns used to protect the drug trafficking business if the jury finds that it was, in fact, a pill mill? And so the words were—the question was to protect. The agent then responded to that by saying, this case is like other cases that I've investigated in the past where guns were used to protect the drug trafficking activity and in furtherance of the drug trafficking— All you're saying is, based on my experience, all other cases have said these defendants are guilty. That's what you said. But given the difficult issue, given—of legal versus facts, and given the discretion that is given— But as Judge Edward has said, that's all the more reason to stay away from it. Correct. Just pushing it up to the edge of the envelope, I mean. But— Okay, go ahead. Go ahead. Go ahead. Given the discretion given to district courts in determining that issue in the heat of the moment, in the heat of trial, Okachukwu cannot show that the district court abused that discretion in admitting the testimony. And even if you think that the district court did abuse its discretion, it was harmless here because of the overwhelming evidence of Okachukwu's guilt on the firearm charges, even without Agent Gordon's testimony. The jury instructions where the judge specifically instructed the jury, you can reject Agent Gordon's testimony. You can throw it out, and you should weigh it against the other evidence in the case and against your—the basis, the reasoning basis that he gives for that opinion. And the court also instructed the jury that he doesn't get any special standing or consideration or weight because he's a federal agent. Now, it was also harmless, too, given that the jury was not even asked to rule on that legal question of whether or not in furtherance was met. The jury was asked to rule on a specific offense of used or carried during or in relation to. So it wasn't even asked to determine the in furtherance issue. And so, by definition, giving a legal conclusion on a question that the jury's not even asked to answer is harmless. Now, turning to the deliberate ignorance instruction. The evidence supported that instruction because there are two requirements. First, the defendant must be subjectively aware of the high probability of risk of criminal activity. Which of the defendants was this instruction directed? It was under the general instruction for knowledge. For everybody? So the jury could have applied it for everybody. Why was this under the general instruction where the case against some of the people is clearly that they actually knew? There are some people that they're claiming they didn't know. But why is this the general instruction? Because it's not supposed to be given when the claim is that they actually, and they're going to show evidence that they're actually participating and not that they're willfully blind in some way. Well, the court has upheld the instruction where the evidence supports it. Well, the court has upheld it, but it's also said that it's given wrongly in a bunch of cases, but we found harmless error in a bunch of cases. And so are you saying that as to every single one of these defendants, they were all showing some deliberate ignorance, that the case was a deliberate ignorance case against them and not that they had actual knowledge? That was the theory of the case as to every defendant in this case. Well, deliberate ignorance is circumstantial evidence of knowledge. So you can't really say that . . . I don't think you're answering Judge Elrod's question. I'm sorry? You're not answering her question. So if it's an actual knowledge versus no knowledge, and deliberate ignorance is evidence of knowledge . . . Right. I understand what deliberate ignorance is, but my question is were you arguing that every single one of these defendants were trying to be, you know, be willfully blind, hiding, and that someone else is running the thing, and that they're all, you know, as we talked about, Ms. Otey, that she's doing what she's supposed to do and is not asking questions about it? You know, so are they all in that situation or are they not? There were three potential . . . Yes or no? No, they were not. Well, then why was it a general instruction as to all the defendants in this case? It should have been specific as to the person who was the deliberate indifference person. All of them, there was overwhelming knowledge that they all had actual knowledge. Then it shouldn't have been given at all. If there's overwhelming of actual, you're not supposed to give the deliberate instruction. We have cases that say that. But when the defendants respond with an argument, we didn't know. We didn't know. I wasn't there. I stayed in the back room. I didn't ask questions. I didn't ask why a homeless person could afford. Why wasn't it tailored to the specific defendants who were deliberately indifferent? You said they weren't all. That wasn't the theory for all of them. Then why wasn't it tailored? Is that just an error? Was it an error not to tailor the instruction for the particular people like Ms. Otey that may have been deliberately indifferent? Sorry. No, I don't believe it was because I think the deliberate ignorance instruction, as far as I didn't know, I was doing my job that I've always done working at pill mills versus for Otey or for Okachukwu. I didn't know. I just glanced at the surveillance video that I had. I looked at these cash logs and saw an impossible number of patients, and I didn't know. And for Iwuho, that I was writing prescriptions, even though I'm not licensed to write prescriptions, that were almost universally for hydrocodone. No, it's not just supposed to be when the person says they didn't know what was going on. It's supposed to be where they're trying to insulate themselves from being knowledgeable about what's going on. They take steps during the conspiracy or the thing to say, I'm insulating myself so I'm not a person who's going to be signing the documents and I'm not a person who's – and so that I can claim that I didn't know. It's not supposed to be just when the person says they didn't know. Right. And in this case, we don't – they have they didn't know, but we also have – I mean, that's what they said, but we also have evidence of purposeful contrivance. As to all of them? As to all of them, which is the second element. And because that's under Laura Valesquez, which says you can have purposeful contrivance, the second prong of deliberate ignorance requirements, if you have overwhelmingly suspicious circumstances plus failure to inquire. And that's what we have in this case. If you accept the defendant's argument that that's – that they failed to inquire and that's just why they didn't know. But even if you believe that it was error to give the instruction because the evidence didn't support it, it was harmless because of the overwhelming evidence of actual knowledge. Is it the policy of the U.S. attorneys in your district to ask for this as a boilerplate instruction in all your criminal cases? No, I don't believe it is. Okay. Turning to the third issue raised, Odie's sufficiency argument. First of all, the standard review for her because she failed to object is devoid of evidence. I think the evidence clearly shows that there was – it was not devoid of evidence of her guilt on count one, and I will rest on the arguments and evidence made in my brief for that point. And then as far as Rutledge's NAPU argument, he fails in all three prongs of the NAPU test. He can't show that it was false for the reasons that Judge Elrod was talking about, that the note is – that the prosecutor's notes that he took in the interview are questionable based on the eyewitness's testimony, that it didn't happen. And second, he can't show that the prosecutor knew it was false because he testified – I mean he told – he spoke to the district court about all of his – he questioned whether or not his notes were accurate when he spoke to other people. Isn't it weird that you would make a note like that and then all of a sudden say, I don't know if the person really said that? I mean that's a pretty specific statement, and it's – it's just an odd thing to make up. Well, his notes are kind of stream of consciousness if you read it. And because he was unsure, he's like, I don't remember saying that, and then he talked about it. He wrote it, and if it had been in the government's favor, he would have insisted that he knew what he was doing. We assume that he knew what he was doing. We assume he didn't write down a lie. I mean that's essentially – it was there, wasn't it, in the notes that he took? It was there. When he read it, he didn't specifically remember saying what was in the notes. Well, I know, but it was there. He must have said it. He wouldn't have just made it up out of hope. And that's why he turned it over because he couldn't be 100 percent sure that his notes were inaccurate. So he turned it over. It was fully disclosed to defense counsel. Why would his notes be inaccurate? Why would he say, I don't know whether my notes are inaccurate about a matter like – I mean I've taken stream of conscious notes before, too, and reviewing them, I'm not quite sure. And you would attribute to a witness statements that he or she did not make. That's not the kind of stream of consciousness that may account for mistakes or unintended statements. But anyway, it doesn't matter. I mean if she did, we'll assume she said it. So we will assume she said it. So where are you now? Then we can't – he can't show the second prong that the prosecutor knew it was false because – assuming it was false because he didn't remember saying it when he spoke to everyone else that was actually in the interview. None of them remembered saying it. And I think any reasonable person would question your memory or the accuracy of your notes. I thought the notes were contemporaneous with the conversation. Am I wrong about that? Right. And the agents were also there during the conversation, and they did not remember it. So if you have other people there not remembering it, it would make any person question it. He also told the judge that he questioned it and wasn't sure – And who wrote these notes? I'm sorry? Who wrote these notes? The prosecutor. The prosecutor himself. Yes, he did. He told the judge that he started to question based on what everyone was telling him. He wasn't sure what the answer would be, so he thought the best decision was to disclose it to defense counsel, bring it up for cross-examination, let the jury decide whether or not she's telling the truth. And that's exactly what happened here. And given those circumstances, there can't be any nephew violation. But assuming that it was true, that he wrote that at the time, and that he wrote it because she said it because he wasn't going to write lies about the conversation he was having, now where does that leave you? Assuming it was true because she said it and he wrote it down. She said it. She wrote it down. And he wrote it down. Right. So that would show, assuming it's true, it would show that she – And then she gets on the witness stand and said I didn't say it, right? Right. And so, I mean, all we have now is a witness denying a statement that she made. So is there anything more to it than that? No. Without the second two elements of nephew, there is no nephew violation. They successfully impeached her, assuming that she was telling the truth. I mean, the defense attorney could say that she was lying on the witness stand about this and her testimony shouldn't be credited in any other respect. That's something you argue about to the jury, I suppose. A witness is probably inconsistent statements, that's all. So if the court has no further questions, I will reserve all my arguments for my brief. Okay, Ms. Hayworth. Thank you. Thank you, ma'am. And we have some rebuttal from Ms. Watson. With respect to the harms error question going to the legal conclusion, the standard says unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction. We believe there is a reasonable possibility because all it has to do is contribute to the conviction. And we still stand on the position that the evidence supporting the gun conviction was not strong, given the testimony from the office manager as to everything that happened with respect to the security guards actually being on. Also, the jury instructions here really didn't help because the jury instructions, given the agents, the testimony about the agents' experience, all that he had done, given the instructions that talked about the fact that he was going to testify about use, carrying, and brandishing a firearm, this was just an unacceptable finger on the scale that we believe. Were the instructions objected to? No, Your Honor, the instructions were not objected to. A couple of other things. Your Honor, you talked about the fact, because I'm sort of doing, I'm doing the rebuttal for everyone. We talked about the fact that there was all of this, all of the opiate epidemic that's going on. The court has to remember that when this offense occurred in 2012 and 2013, we didn't have all of that information. So there wasn't this information out there about all these people that are dying. There were only about 20,000 people a year dying back then. But it was still not as prevalent in the news. I concede that. I concede it's much worse now. Yes. But there were tens of thousands of people dying, even back in 2012 and 2013. Yes, Your Honor. Also, with respect to the deliberate ignorance instruction, I was told by counsel that 1994 was the last time that he was able to find a case where this court had reversed. And also with respect to deliberate ignorance, only one defendant testified, and that was Dr. Okechukwu. And the evidence there was either he knew or he didn't know. There wasn't any middle ground, and there also wasn't any evidence that he deliberately contrived not to know. Either he knew or he didn't know. And that's essentially what the evidence says. So he's the only defendant that testified in his or her behalf. Yes, sir. He was the only one. And so clearly the instructions should have been tailored to the particular defendants, and actually it shouldn't apply to any of the defendants in this case. But, I mean, the statements were introduced. The government had interviewed these other witnesses who had more or less denied any knowledge that they knew anything that was going on. Well, actually, Your Honor, the testimony was very limited as to what happened in the interviews because of some objections by the parties. May it please the Court that we will submit on the briefs. Thank you. Thank you, Ms. Watson. Call the next case of the day.